IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
STATE OF ALABAMA

SHIRLEY K. WADSWORTH,          )
                               )
     Plaintiffs,               )
                               )
vs.                            ) CV 02-2850-H
                               )
UNITED WISCONSIN LIFE          )
INSURANCE COMPANY, et al.,     )
                               )
     Defendant.                )

DEPOSITION OF:   BARBARA WATSON

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of BARBARA WATSON may be taken on February 12, 2003, before Anne E. Miller, Commissioner and Notary Public, at Lowe, Grammas, Hitson & Dana, 3500 Blue Lake Drive, Suite 209, Birmingham, Alabama.

---

APPEARANCES

Appearing For The Plaintiff:

    LOWE, GRAMMAS, HITSON & DANA
    Mr. E. Clayton Lowe, Jr.
    Mr. Brent Hitson
    3500 Blue Lake Drive
    Suite 209
    Birmingham, Alabama 35243

Appearing For The Defendant:

    BURR & FORMAN
    Mr. Harlan F. Winn, III
    3100 SouthTrust Tower
    Birmingham, Alabama 35203

    JANECKY, NEWELL
    Ms. Nancy Howell Lard
    1475 Financial Center
    Birmingham, Alabama 35203

Court Reporter:  Anne E. Miller



RECEIVED JUN 0 6 2005

---

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds as the time of trial or at the time said deposition is offered in evidence or prior thereto.

---

INDEX

Examination by Mr. Lowe .............. 5

Plaintiff's Exhibit 1 ................ 34
Plaintiff's Exhibit 2 ................ 56
Plaintiff's Exhibit 3 ................ 82
Plaintiff's Exhibit 4 ................ 98
Plaintiff's Exhibit 5 ................ 104
Plaintiff's Exhibit 6 ................ 104
Plaintiff's Exhibit 7 ................ 182
Plaintiff's Exhibit 8 ................ 186
Plaintiff's Exhibit 9 ................ 193
Plaintiff's Exhibit 10 ............... 202
Plaintiff's Exhibit 11 ............... 204
Plaintiff's Exhibit 12 ............... 209
Plaintiff's Exhibit 13 ............... 214
Plaintiff's Exhibit 14 ............... 226
Plaintiff's Exhibit 15 ............... 230
Plaintiff's Exhibit 16 ............... 236
Plaintiff's Exhibit 17 ............... 237
Plaintiff's Exhibit 18 ............... 254
Plaintiff's Exhibit 19 ............... 265
Plaintiff's Exhibit 20 ............... 275



EXHIBIT C

57
1  application, yes, I have seen one.
2    Q. How did you come to see an
3  application? Was it in preparation for this
4  deposition or is it something that you
5  handled in administering this trust?
6    A. It was in preparation for the
7  deposition.
8    Q. So you hadn't seen one before?
9    A. No. I would have no reason to.
10    MR. WINN: Just answer his question.
11    Q. Was this a document that the bank has
12  in its possession or similar document?
13  Maybe not signed by Shirley Wadsworth but
14  this form?
15    A. No.
16    Q. So how did you come to see it then?
17    MR. WINN: She said she saw it in
18  connection with her deposition preparation,
19  and that's all I'm going to allow her to
20  testify about.
21    Q. (BY MR. LOWE) Let's look at the
22  first paragraph of Exhibit 2. It says, "The
23  undersigned applicant hereby agrees to

58
1  participate in the American Medical Security
2  or Prescription for Good Health Trust.
3  Insurance is provided through policies
4  procured by the trustee of American Medical
5  Security or Prescription for Good Health
6  Trust." Did I read that correctly?
7    A. Uh-huh (yes).
8    Q. Who is the trustee of the American
9  Medical Security Trust?
10    A. The trustee for the Prescription for
11  Good Health Trust is AmSouth.
12    Q. Who is the trustee for American
13  Medical Security Trust?
14    A. I believe AmSouth is.
15    Q. Now this document, are you aware that
16  this document is given to perspective
17  participants to sign up to become
18  participants in the group insurance trust?
19    A. No.
20    Q. You don't understand that?
21    A. Would you say that again?
22    Q. Do you understand that this document,
23  Exhibit 2, that's entitled "terms and

59
1  conditions of the trust," is given to
2  perspective participants such as Shirley
3  Wadsworth in order to allow them to apply to
4  become participants in the group insurance
5  trust?
6    A. Yes.
7    MR. WINN: I want to object to the
8  question. To the extent that you are asking
9  her about a piece of a document, it's not a
10  complete document there. You can answer the
11  question, but I think it's unfair.
12    MR. LOWE: Well, we disagree about
13  whether it's a complete document.
14    MR. WINN: That's fine. I'm just
15  making my objection.
16    Q. (BY MR. LOWE) And your answer, I
17  think I heard you say yes?
18    A. Yes.
19    MR. WINN: You are right. That's
20  what she said.
21    Q. The last sentence I read, focus on
22  that. It references that the policies are
23  procured by the trustee. Did AmSouth

60
1  procure the policies of insurance that
2  relate to the Prescription for Good Health
3  Trust?
4    MR. WINN: Object to the form of the
5  question. I think it's confusing, but if
6  you understand it, you can answer.
7    A. AmSouth procures or gets the master
8  policies for the Prescription for Good
9  Health Trust, and it's my understanding that
10  certificates are then issued by someone
11  other than AmSouth to the actual insureds.
12    Q. What does AmSouth do to procure this
13  insurance for the trust referenced in
14  Exhibit 2?
15    A. There is an application. AmSouth as
16  trustee is the applicant and they apply for
17  the policy, the master policy, to United
18  Wisconsin.
19    Q. Does AmSouth make any effort to
20  determine whether one policy provided by
21  United Wisconsin may be a better policy than
22  another?
23    A. No.

**Page 117**

1  base the statements made in this affidavit
2  upon?
3      A. The only records I reviewed
4  specifically before signing this one is the
5  Prescription for Good Health. Now I have
6  seen in my year --
7      MR. WINN: Just answer the question
8  that he asked.
9      Q. And your answer was? He cut you off.
10 What was your answer?
11     A. The only one I read directly before
12 signing this one was the Prescription for
13 Good Health Trust.
14     Q. Now what part of this affidavit then
15 is based upon your personal knowledge
16 derived from your employment
17 responsibilities and duties?
18     MR. WINN: If you need to read it --
19 are you asking for a particular portion of
20 this affidavit?
21     MR. LOWE: Yes. Take your time and
22 look at it again.
23     A. Well, I handled the group insurance

**Page 118**

1  trust, the accounts themselves for a period
2  of time. So I had personal knowledge in
3  handling them.
4      Q. What did you do to handle them? I
5  guess we haven't really touched on that
6  enough.
7      A. You accept the policies. You hold
8  the policies. You fee for your services.
9  If an application comes in for a group
10 policy, then you review it and --
11     Q. How about corresponding with
12 Departments of Insurance or regulatory
13 authorities or anything like that that have
14 a question of AmSouth regarding the trust?
15 Is that something you also handled?
16     A. I never personally handled any
17 correspondence.
18     Q. Did you supervise that?
19     A. No.
20     Q. Did people under you handle that?
21     A. No.
22     Q. Are you saying that didn't happen?
23     A. No. I'm not saying that didn't

**Page 119**

1  happen. My personal knowledge, I don't know
2  of correspondence.
3      Q. So is it fair to say then in your
4  handling of this trust that you never had
5  any correspondence or prepared any forms
6  that you knew were going to a Department of
7  Insurance or the Department of Labor or
8  anything like that?
9      A. Yes.
10     Q. You did do that?
11     A. No. It's fair to say I did not do
12 that.
13     Q. Okay. And to your knowledge then, no
14 one else at the bank did that?
15     MR. WINN: To your knowledge is what
16 he is asking.
17     A. To my knowledge, I don't know.
18     Q. (BY MR. LOWE) Let's look at
19 paragraph three of your affidavit, Exhibit
20 5. Do you see where it says "this trust
21 owns group insurance contracts as is
22 described in the trust agreement"? Do you
23 see that?

**Page 120**

1      A. Uh-huh (yes).
2      Q. We talked a little bit about group
3  insurance earlier. Do you know the
4  distinction between individual insurance and
5  group insurance?
6      MR. WINN: Object to the extent it
7  calls for a legal conclusion. Otherwise,
8  you can answer what you know.
9      A. Well, I mean, I think I have a basic
10 understanding of what is the difference
11 between an individual policy and a group
12 insurance policy.
13     Q. I assume you have insurance policies
14 for yourself, don't you?
15     A. Right.
16     Q. And I would also assume -- and tell
17 me if I'm wrong -- that the ones you
18 probably have through your employer are
19 group insurance, right?
20     A. Yes.
21     Q. And it's because you are a large
22 group of employees; is that right?
23     A. Uh-huh (yes).

129

1 that right?
2     MR. WINN: Object to the form of the
3 question.
4     A. The document states that we hold the
5 policies.
6     Q. Among other things, true. I mean,
7 that's what it says in one instance. But
8 you have stated here that this insurance
9 policy was issued for the benefit of the
10 participants. Now how do you know that?
11     A. The insureds are the beneficiaries.
12 It's for their benefit.
13     Q. Okay. Who is looking out for their
14 benefit under this trust? Is it AmSouth,
15 United Wisconsin, AMS or someone else?
16     A. AmSouth holds the policies.
17     MR. WINN: Listen to his question.
18 If you know the answer, you can give him the
19 answer. If you don't know the answer, then
20 tell him you don't know the answer. Ask the
21 question again or read it back.
22         (Record read.)
23     A. I don't know.

130

1     Q. (BY MR. LOWE) Can you think of
2 anyone at AmSouth that might know the answer
3 to that question?
4     A. No.
5     Q. Let's look at paragraph four of your
6 affidavit, Exhibit 5. Do you need a second
7 to read through it? It's a longer
8 paragraph.
9     A. Okay.
10     Q. Let's look at the first sentence,
11 which states pursuant to the trust
12 agreement, AmSouth does not perform any
13 administrative duties and has no
14 "responsibility" nor [liability] for the
15 collection, remittance, [or] forwarding or
16 payment of premium." And you site the trust
17 agreement paragraph three that you attached
18 and which is Exhibit 6 to your deposition.
19 Now do you determine that to be a true and
20 correct interpretation of the trust
21 agreement?
22     A. Yes.
23     Q. And did you read paragraph three of

131

1 the trust agreement before you prepared this
2 statement in this affidavit?
3     MR. WINN: Object to the form of the
4 question, to the extent it misconstrues
5 prior testimony.
6     Q. Did you?
7     A. What's your question again?
8     Q. Did you read paragraph three of
9 Exhibit 6, the trust agreement, before
10 preparing and signing this statement here in
11 paragraph four of Exhibit 5?
12     MR. WINN: Same objection.
13     A. I believe I stated before, I read the
14 trust agreement before I signed the
15 affidavit.
16     Q. Are there any other places in the
17 trust agreement where you believe duties of
18 the trustee were assigned or given to
19 American Medical other than here in
20 paragraph three?
21     MR. WINN: I'm going to object to the
22 form of that question. I think that
23 misconstrues the affidavit.

132

1     Q. (BY MR. LOWE) Let me rephrase that.
2 Paragraph three of Exhibit 6 says that
3 trustee shall not assume any responsibility
4 for certain things. And then it goes on to
5 say nor shall the trustee have any duty or
6 responsibility for certain things. Now is
7 there any other paragraph in the trust
8 agreement, Exhibit 6, that you rely upon to
9 assert that the trustee doesn't undertake
10 certain obligations?
11     MR. WINN: Object to the form of the
12 question. I think it's totally long and
13 confusing.
14     Q. Do you have an answer? Just because
15 Harlan is talking doesn't mean you don't
16 have to answer.
17     A. I would need to read the entire
18 agreement to see if there are other areas.
19     Q. Well, you read it before you came in
20 here, and you read it before you signed this
21 affidavit, didn't you?
22     A. Yes, I did.
23     Q. Okay.

169

whatever?
A. I'm not sure how the vault is. I don't go down to the vault. I'm not sure how they hold them. They would do it either by the plan, the group insurance trust, or by the security itself.
Q. How much or how many pieces of paper do you think this involves?
    MR. WINN: What involves?
Q. Just all this whole Prescription for Good Health Trust.
A. This is a relatively small one of the group insurance trusts. It doesn't have any sub industries or -- it's got a master policy, some riders, some amendments.
Q. That's the Prescription for Good Health Trust. What about the American Medical Security Trust? It has sub accounts, doesn't it?
A. It has volumes.
Q. How many pages would that be? Or if you want to equate it to like the size of a banker's box? Do you know what that looks

170

like?
A. It's more than that.
Q. I'm saying how many boxes would that be?
A. I couldn't tell you.
Q. Well, more than ten?
A. I honestly -- no, I don't think so.
Q. Looking at Exhibit 6, the trust agreement, paragraph 20, it notes that the trust may be amended upon unanimous consent of the trustee and the insurers. Have you, the bank, ever made an effort upon its own to amend the trust?
A. No.
Q. Has the bank ever considered terminating the trust?
    MR. WINN: Let me just object to the extent you are asking for any information that may have come from the legal department. To the extent you are asking her from a business standpoint, if she knows -- and I don't know if she does or not -- I would allow her to answer. But to

171

the extent you are requesting any information she may have got from the legal department, I'm going to object. Do you understand the question as I have modified by objection?
Q. (BY MR. LOWE) I think he is asking you a question now.
A. Would somebody tell me what the question is?
Q. Has the bank considered terminating this trust agreement; that is, getting out of it?
A. That would be a business decision for the whole line of business, I believe.
Q. I know, but you are here to testify on behalf of the bank. Have you ever heard any discussions regarding getting out of this trust agreement?
A. There is constant discussion about what lines of business we want to stay in and stay out of.
Q. Specifically paragraph seven gives you the right to resign.

172

A. Correct.
Q. Have there been any discussions within AmSouth Bank about resigning as trustee?
A. There have been discussions about exiting this line of business as a whole.
Q. For what reason?
A. It's not an area that we are focusing on going forward. We really don't want to have products that are flat based fees that are not profitable and don't make money for us. We are there to make money, manage money. That's where we make our money. So going forward would not be taking on any more of these.
Q. Well, you have had this one since 1994. I mean, has a decision been made to resign at some point?
A. Discussions are always ongoing about our different product lines that we offer.
    MR. WINN: What he is asking you has a specific decision been made that you are aware of to resign from this type of